# United States Court of Appeals
## For the First Circuit

---

No. 01-1975

IN RE GRAND JURY SUBPOENA

(CUSTODIAN OF RECORDS, NEWPARENT, INC.),

———————

A. NAMELESS LAWYER (A PSEUDONYM) ET AL.,

Intervenors, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

---

Before

Selya and Lipez, Circuit Judges,
and Doumar,* Senior District Judge.

---

Andrew Good, with whom Harvey A. Silverglate, Silverglate
& Good, Norman Zalkind, David Duncan, Zalkind, Rodriguez, Lunt
& Duncan, Martin G. Weinberg, Oteri, Weinberg & Lawson,
Elizabeth B. Burnett, and Mintz Levin Cohn Ferris Glovsky &
Popeo were on consolidated brief, for appellants.
John M. Hodgens, Jr., Assistant United States Attorney, with
whom James B. Farmer, United States Attorney, and Stephen P.
Heymann, Assistant United States Attorney, were on brief, for
the United States.

---

November 8, 2001

---

_____
*Of the Eastern District of Virginia, sitting by designation.

**SELYA, Circuit Judge.** This appeal requires us to traverse largely unexplored terrain concerning the operation of the attorney-client and work product privileges. The underlying controversy arises out of a subpoena duces tecum issued by a federal grand jury to a corporation, seeking records pertaining to the affairs of a subsidiary. Although the corporation and the subsidiary waived all claims of privilege, the subsidiary's former attorney and two of its former officers intervened and moved to quash the subpoena. They claimed that the subsidiary had entered into a longstanding joint defense agreement with the former officers and contended that the subpoenaed materials were privileged (and, thus, not amenable to disclosure). The district court eschewed an evidentiary hearing and denied the motion to quash, but stayed production of the documents pending appeal.

We affirm the district court's order. We hold that an individual privilege may exist in these circumstances only to the extent that communications made in a corporate officer's personal capacity are separable from those made in his corporate capacity. Because the intervenors do not allege that any of the subpoenaed documents are solely privileged to them but rest instead on the theory that all the documents are jointly privileged, their claim, as a matter of law, does not survive

the subsidiary's waiver. The joint defense agreement does not demand a different result: privileges are created, and their contours defined, by operation of law, and private agreements cannot enlarge their scope. Moreover, this particular joint defense agreement is unenforceable.

We have a second, independently sufficient ground for our decision. The denial of the motion to quash must be upheld in all events because the intervenors failed to generate a descriptive list of the documents alleged to be privileged.

## I. BACKGROUND

We start by recounting the events leading to this appeal. Consistent with the secrecy that typically attaches to grand jury matters, see, e.g., Fed. R. Crim. P. 6(e), this case has gone forward under an order sealing the proceedings, the briefs, and the parties' proffers. To preserve that confidentiality, we use fictitious names for all affected persons and corporations.

On March 26, 2001, Oldco — a Massachusetts corporation in the business of processing, packaging, and distributing food products — entered into a plea agreement with the United States Attorney for the District of Massachusetts. Under the agreement's terms, Oldco pled guilty to charges of conspiracy to defraud the Internal Revenue Service and agreed to cooperate

-4-

with the government's ongoing investigation of certain present and former officers, employees, and customers. As part of this cooperation, Oldco expressly waived applicable attorney-client and work product privileges. Soon thereafter, a federal grand jury issued a subpoena duces tecum to Oldco's parent corporation, Newparent, Inc., demanding the production of documents relating to its "rebate program" — a program under which, according to the government, Oldco would charge certain complicit customers more than the going rate for its products, but would then refund the difference by payments made directly to principals of these customers.

At the time the subpoena was served, Oldco was a wholly-owned subsidiary of Newparent. Its records were in the possession of Newparent's counsel, a law firm that we shall call Smith & Jones. Newparent had acquired Oldco in June of 1998, but the grand jury investigation focused on conduct that occurred prior to the acquisition date. During that earlier period, Oldco had operated as a closely held corporation, owned by a number of members of a single family; one family member (Richard Roe) served as its board chairman and chief executive officer, and another (Morris Moe) served on the board and as executive vice-president for sales and marketing. A. Nameless Lawyer was Oldco's principal outside counsel. These three

individuals — Roe, Moe, and Lawyer — intervened in the proceedings and filed a motion to quash the subpoena.

The factual premise for the motion to quash is derived largely from Lawyer's affidavit. He states that while representing Oldco he also represented Roe and Moe in various individual matters. Moreover, he claims to have conducted this simultaneous representation of corporate and individual clients under a longstanding joint defense agreement. According to Lawyer, this agreement, although never committed to writing, provided that communications among the three clients were jointly privileged and could not be released without unanimous consent. Despite the absence of any reference to this agreement in the corporate records — there was no resolution or other vote of the board of directors authorizing Oldco to participate in such an arrangement — the intervenors assert that Roe, as chief executive officer, had the authority to commit the corporation to it.

Pertinently, Lawyer claims to have represented Oldco and its officers in connection with the grand jury investigation from and after October 1997 (when the grand jury served Oldco with an earlier subpoena requesting the production of certain customer records). He says that the oral joint defense agreement applies to this multiple-party representation and that

-6-

he told the government that he represented Oldco and "all of its executives."

There is, to be sure, a written joint defense agreement entered into by and between Lawyer, as counsel for Roe/Moe, and Smith & Jones, as counsel for Newparent/Oldco.[1]  However, that agreement was not executed until the fall of 1999 (by which time Lawyer was no longer representing Oldco).  There is no evidence in the voluminous record (apart from Lawyer's affidavit) that any joint defense agreement existed before that time.  Moreover, the intervenors neglected to mention the existence of an oral joint defense agreement when Newparent acquired Oldco and likewise failed to incorporate any reference to such a pact into the subsequent written agreement.

Notwithstanding these discrepancies, the intervenors solemnly maintain that the oral joint defense agreement existed from 1990 forward; that its terms apply to the grand jury investigation; and that it gives them a joint privilege — they mention both attorney-client and work product  privileges — in the Oldco documents currently in the hands of  Smith & Jones. But they do not identify any particular documents as privileged, nor do they specify the reasons why certain communications

_____

[1]The written joint defense agreement need not concern us as the grand jury has limited its request to documents predating the execution of that agreement.

-7-

should be considered privileged. Thus, like soothsayers scrutinizing the entrails of a goat, we are left to scour the record for indications of what these documents might be and what they might contain. As best we can tell, some of the documents comprise transcripts of interviews with Oldco employees (including Roe and Moe); others comprise Lawyer's written summaries of Oldco's internal investigation into the rebate program.

Not surprisingly, the government and Oldco both filed oppositions to the intervenors' motion to quash. In response, the intervenors sought leave to present immunized evidence with respect to the privilege claims. They also filed a formal offer of proof and requested an evidentiary hearing. The district court denied the motion to quash at a non-evidentiary hearing held on July 2, 2001, thereby implicitly denying the intervenors' other requests. This expedited appeal ensued.

## II. JUSTICIABILITY

We turn first to a pair of threshold questions that implicate our authority to hear and determine this appeal. Neither question need occupy us for long.

First, we are satisfied that Roe, Moe, and Lawyer were properly allowed to intervene in the proceedings below for the purpose of pursuing quashal of the subpoena. Intervention is

appropriate as of right when the disposition of an action may impair or impede the applicant's cognizable interest. Fed. R. Civ. P. 24(a)(2). Colorable claims of attorney-client and work product privilege qualify as sufficient interests to ground intervention as of right. See In re Grand Jury Proceedings (Diamante), 814 F.2d 61, 66 (1st Cir. 1987) (implying that "the existence of a privileged relationship or of a legitimate property or privacy interest in the documents possessed by the third party" is sufficient to establish standing). Clearly, those interests would be forfeited if Newparent were to comply with the grand jury subpoena — and, as matters now stand, Newparent has no incentive to protect the intervenors' interests. Consequently, this is a textbook example of an entitlement to intervention as of right.

Second, although denial of a motion to quash a subpoena is not usually considered a final judgment and thus is not ordinarily an appealable event, we believe that we have appellate jurisdiction in this instance. An exception to the requirement of finality exists when "a substantial privilege claim . . . cannot effectively be tested by the privilege-holder through a contemptuous refusal [to produce the documents]." FDIC v. Ogden Corp., 202 F.3d 454, 459-60 (1st Cir. 2000); see also Perlman v. United States, 247 U.S. 7, 12-13 (1918)

(recognizing that, as a practical matter, denials of an intervenor's privilege-based motion to quash a subpoena must be immediately appealable because no effective post-judgment remedy otherwise would exist). Courts have invoked this exception when, as now, "a client (who is herself a party or a grand jury target) seeks to appeal an order compelling her attorney . . . to produce allegedly privileged materials." Ogden, 202 F.3d at 459; accord In re Grand Jury Subpoenas, 123 F.3d 695, 697 (1st Cir. 1997). Although in this case the documents are in the hands of Newparent's counsel rather than in the custody of the intervenors' counsel, this only reinforces the essential fact that, absent an immediate appeal, the allegedly privileged material will be disclosed. Accordingly, we have jurisdiction to hear and determine this appeal.

## III. THE MERITS

This appeal presents a smorgasbord of legal issues, but we must forgo the temptation to sample them all. Instead, we masticate only those issues that are necessary to a principled resolution of the matter.

We begin by discussing the ramifications of Roe's and Moe's claim that they were individual clients of Lawyer with

respect to the grand jury investigation. We conclude that although such individual representation might have occurred in theory, no individual privilege exists as to documents in which Oldco also has a privilege. Because no independently enforceable privilege is alleged here, the corporation's waiver is effective for all communications covered by the subpoena, notwithstanding the existence _vel non_ of the oral joint defense agreement. In all events, the intervenors failed adequately to inform the district court of the particular communications to which their claims of privilege allegedly attached. In the pages that follow, we proceed to discuss these issues one by one.

### A. Privilege Claims.

Because the attorney-client and work product privileges differ, we treat them separately.

**1. Individual Attorney-Client Privilege Claims.** The attorney-client privilege protects communications made in confidence by a client to his attorney. _See_, _e.g._, _United States_ v. _Mass. Inst. of Tech._, 129 F.3d 681, 684 (1st Cir. 1997) (limning the scope of the privilege). Because it stands in the way of a grand jury's right to every man's evidence, the privilege applies only to the extent necessary to achieve its underlying goal of ensuring effective representation through

open communication between lawyer and client.  See Fisher v. United States, 425 U.S. 391, 403 (1976).

Roe and Moe can mount a claim of attorney-client privilege only if, and to the extent that, Lawyer represented them individually.  If the only attorney-client privilege at stake is that of their corporate employer, then Oldco's waiver defeats the claim of privilege.  After all, the law is settled that a corporation's attorney-client privilege may be waived by current management.  See CFTC v. Weintraub, 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney client privilege passes as well.").

It is often difficult to determine whether a corporate officer or employee may claim an attorney-client privilege in communications with corporate counsel.  The default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals' burden to dispel that presumption.  See United States v. Bay State Ambul. & Hosp. Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir. 1989).  This makes perfect sense because an employee has a duty to assist his employer's counsel in the investigation and defense of matters pertaining to the

employer's business.  See United States v. Sawyer, 878 F. Supp

295, 296 (D. Mass. 1995).

To determine when this presumption bursts, several

courts have adopted the test explicated in In re Bevill, Bresler

& Schulman Asset Mgmt. Corp., 805 F.2d 120 (3d Cir. 1986).  That

test enumerates five benchmarks that corporate employees seeking

to assert a personal claim of attorney-client privilege must

meet:

> First, they must show they approached
> [counsel] for the purpose of seeking legal
> advice.  Second, they must demonstrate that
> when they approached [counsel] they made it
> clear that they were seeking legal advice in
> their individual rather than in their
> representative capacities.  Third, they must
> demonstrate that the [counsel] saw fit to
> communicate with them in their individual
> capacities, knowing that a possible conflict
> could arise.  Fourth, they must prove that
> their conversations with [counsel] were
> confidential.  And fifth, they must show
> that the substance of their conversations
> with [counsel] did not concern matters
> within the company or the general affairs of
> the company.

Id. at 123; accord Grand Jury Proceedings v. United States, 156

F.3d 1038, 1041 (10th Cir. 1998); United States v. Int'l Bhd. of

Teamsters, 119 F.3d 210, 215 (2d Cir. 1997); In re Sealed Case,

29 F.3d 715, 719 n.5 (D.C. Cir. 1994).

We think that Bevill's general framework is sound.  Of

course, the first four elements of its test are most relevant

-13-

when an attorney disputes a corporate officer's claim of individual privilege. Here, however, Lawyer's affidavit makes it clear that he represented both Roe and Moe in their personal capacities. Thus, even though the intervenors' brief does not specifically address the <u>Bevill</u> factors, we assume for argument's sake that the first four prongs of the test are satisfied.

With respect to the final prong, the government claims that all of Roe's and Moe's communications were within the orbit of Oldco's general affairs, and therefore could not be individually privileged. In the government's view, <u>Bevill</u> precludes a finding of individual representation with respect to matters — such as the grand jury investigation into the rebate program — that involve the corporation. We do not read <u>Bevill</u> so grudgingly. As the Tenth Circuit explained:

> The fifth prong of <u>In Matter of Bevill</u>, properly interpreted, only precludes an officer from asserting an individual attorney client privilege when the communication concerns the <u>corporation's</u> rights and responsibilities. However, if the communication between a corporate officer and corporate counsel specifically focuses upon the <u>individual</u> <u>officer's</u> personal rights and liabilities, then the fifth prong of <u>In Matter of Bevill</u> can be satisfied even though the general subject matter of the conversation pertains to matters within the general affairs of the company.

Grand Jury Proceedings, 156 F.3d at 1041. We adopt this interpretation and conclude that, theoretically, Lawyer could have represented Roe and Moe individually with respect to the grand jury investigation. Still, this attorney-client relationship would extend only to those communications which involved Roe's and Moe's individual rights and responsibilities arising out of their actions as officers of the corporation.

2. **The Corporation's Right to Waive the Attorney-Client Privilege.** Having concluded that there are potentially some communications protected by the attorney-client privilege, we next consider the effect of Oldco's waiver of that privilege. The major difficulty — there are others, but we need not discuss them here — is that the individuals' allegedly protected communications with Lawyer do not appear to be distinguishable from discussions between the same parties in their capacities as corporate officers and corporate counsel, respectively, anent matters of corporate concern. The intervenors propose that such "dual" communications be treated as jointly privileged such that the consent of all parties would be required to waive the privilege. But they fail to cite authority supporting this position, and we ultimately decline to accept it: permitting a joint privilege of this type would unduly broaden the attorney-client privilege by allowing parties outside a given attorney-

-15-

client relationship to prevent disclosure of statements made by the client.

The reference to an alleged joint defense agreement does little to advance the intervenors' argument on this point. "The joint defense privilege protects communications between an individual and an attorney for another when the communications are 'part of an ongoing and joint effort to set up a common defense strategy.'" Bay State Ambul., 874 F.2d at 28 (citation omitted). Because the privilege sometimes may apply outside the context of actual litigation, what the parties call a "joint defense" privilege is more aptly termed the "common interest" rule. See United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). Even when that rule applies, however, a party always remains free to disclose his own communications. See In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 922 (8th Cir. 1997). Thus, the existence of a joint defense agreement does not increase the number of parties whose consent is needed to waive the attorney-client privilege; it merely prevents disclosure of a communication made in the course of preparing a joint defense by the third party to whom it was made.

In the clamor over the existence vel non of a joint defense agreement, the parties tend to overlook case law dealing directly with the circumstances under which statements made in

-16-

a joint conference remain privileged.  Although these cases do not speak with one voice, they inform our resolution of the issue.  They establish that joint communications with a single attorney are privileged with respect to the outside world because clients must be entitled to the full benefit of joint representation undiluted by fear of waiving the attorney-client privilege.  See Ogden, 202 F.3d at 461.  Nevertheless, the privilege does not apply in subsequent litigation between the joint clients, see id.; in that sort of situation, one client's interest in the privilege is counterbalanced by the other's interest in being able to waive it.

The instance of a criminal investigation in which one former co-client is willing to aid in the prosecution of the other lies in the wasteland between these two doctrinal strands, and courts have split on whether the target of the prosecution may block disclosure in this context.  See McCormick on Evidence, § 91 at 365 n.13 (John W. Strong ed., 5th ed. 1999) ("Whether the privilege is effective where one joint client is prosecuted and the other is willing to testify as to the joint consultations is a question which has divided the courts."); see also Conn. v. Cascone, 487 A.2d 186, 189-90 (Conn. 1985) (collecting cases on both sides of the issue).

Although the instant case arises as a motion to quash a subpoena, rather than as an attempt to block a former co-client's testimony, the issue of privilege is entirely congruent. But there is another difference here — a significant one that cuts against the intervenors. In this iteration, the former co-clients were not independent actors, but, rather, corporate officers who owed a fiduciary duty to the corporation. Faced with an analogous assertion of privilege by corporate managers, the Fifth Circuit has held that the managers' interest must yield to the shareholders' interest in disclosure of the privileged materials. Garner v. Wolfinbarger, 430 F.2d 1093, 1101-04 (5th Cir. 1970). Taking a similar tack, we hold that a corporation may unilaterally waive the attorney-client privilege with respect to any communications made by a corporate officer in his corporate capacity, notwithstanding the existence of an individual attorney-client relationship between him and the corporation's counsel.

The line we draw parallels the holding of Bevill, 805 F.2d at 124 (rejecting the contention that "because [corporate officers'] personal legal problems were inextricably intertwined with those of the corporation, disclosure of discussions of corporate matters would eviscerate their personal privileges"). In this regard, we think it significant that the fifth prong of

the _Bevill_ test is stated in the negative:  communications may be individually privileged only when they "[do] not concern matters within the company or the general affairs of the company," rather than when they _do_ concern an individual's rights.  _Id._ at 123 (emphasis supplied).

On this view, it follows that Roe or Moe may only assert an individual privilege to the extent that communications regarding individual acts and liabilities are segregable from discussions about the corporation.  When one bears in mind that a corporation is an incorporeal entity and must necessarily communicate with counsel through individuals, the necessity for such a rule becomes readily apparent.  Holding otherwise would open the door to a claim of jointly held privilege in virtually every corporate communication with counsel.

Here, neither Roe nor Moe have even attempted to make any showing of segregability.  On the contrary, their main argument in the district court and on appeal appears to be that the documents at issue do not lend themselves to separation into individual and corporate categories.  The intervenors' brief is replete with references to "joint privilege," but contains no allegation that any particular communication related solely to the representation of Roe or Moe.  Given the absence of such an allegation and the allocation of the burden of proof (which, on

this issue, rests with the intervenors), we perceive no error in the district court's explicit finding that "all communications in this case are corporate communications." That dooms the intervenors' claim of attorney-client privilege, see Grand Jury Proceedings, 156 F.3d at 1042 (rejecting claim of individual privilege when "appellant has not produced for [the court's] review the particular documents at issue nor has he otherwise adequately demonstrated in the record that any of the documents ordered produced were limited to the topic of his individual legal rights and responsibilities"), and renders moot the question of whether Roe and Moe also possessed an attorney-client privilege in these documents.

3. **The Work Product Privilege.** The claim of work product privilege raises a similar set of issues anent joint privilege. The work product rule protects work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party. E.g., Sealed Case, 29 F.3d at 718. The rule facilitates zealous advocacy in the context of an adversarial system of justice by ensuring that the sweat of an attorney's brow is not appropriated by the opposing party. Hickman v. Taylor, 329 U.S. 495, 511 (1947). Although the record does not include an index of allegedly privileged documents — a shortcoming to which we shall return — it appears

-20-

that at least two categories of files contemplated by the subpoena might qualify as work product: Lawyer's interviews of employees during Oldco's internal investigation into the rebate program, and his notes and mental impressions of the investigation.

Roe, Moe, and Lawyer as their attorney may, at least in theory, invoke the work product privilege as to work done exclusively for Roe and Moe as individuals. Yet, their argument does not claim exclusivity,[2] but, rather, amounts to an insistence that they should have a veto over the disclosure of documents produced for the joint benefit of the individuals and the corporation. As in the case of the attorney-client privilege, however, the intervenors may not successfully assert the work product privilege with respect to such documents. Because they effectively conceded that the work was performed, at least in part, for the corporation, Oldco's waiver of all privileges negates their potential claim of privilege. In these circumstances, therefore, the work product privilege does not preclude disclosure of the documents sought by the subpoena.

---

[2]For example, with respect to the employee interviews conducted by Lawyer, the intervenors argued to the lower court that the work product privilege does not belong exclusively to Oldco because the work was performed on behalf of all three clients.

Undaunted, the intervenors argue that the presence of the oral joint defense agreement demands a different result. We do not agree. Although a valid joint defense agreement may protect work product, see In re Grand Jury Subpoenas, 902 F.2d 244, 249 (4th Cir. 1990), one party to such an agreement may not preclude disclosure of work product by another party on whose behalf the work originally was performed. Nor can the parties, by agreement, broaden the scope of the privilege that the law allows. See United States v. Lee, 107 F. 702, 704 (C.C.E.D.N.Y. 1901). Such an agreement would contravene public policy (and, hence, would be unenforceable).[3]

We add, moreover, that the type of joint defense agreement described in Lawyer's affidavit would be null and void. After all, a primary requirement of a joint defense agreement is that there be something against which to defend. Bay State Ambul., 874 F.2d at 28. In other words, a joint defense agreement may be formed only with respect to the subject of potential or actual litigation. Polycast Tech. Corp. v. Uniroyal, Inc., 125 F.R.D. 47, 50 (S.D.N.Y. 1989). Lawyer's affidavit avers that his three clients (Oldco, Roe, and Moe)

---

[3]This same reasoning applies to defeat the intervenors' claim that the parties' understanding, at the time they entered into the oral joint defense agreement, somehow serves to trump the normal operation of the attorney-client privilege. See Lee, 107 F. at 704.

-22-

entered into an oral joint defense agreement in 1990, at which time no particular litigation or investigation was in prospect. The agreement thereafter remained in effect, Lawyer says, attaching ex proprio vigore to all matters subsequently arising (including the current grand jury investigation). The law will not countenance a "rolling" joint defense agreement of this limitless breadth.

The rationale for recognizing joint defense agreements is that they permit parties to share information pertinent to each others' defenses. See Hunydee v. United States, 355 F.2d 183, 185 (9th Cir. 1965). In an adversarial proceeding, a party's entitlement to this enhanced veil of confidentiality can be justified on policy grounds. But outside the context of actual or prospective litigation, there is more vice than virtue in such agreements. Indeed, were we to sanction the intervenors' view, we would create a judicially enforced code of silence, preventing attorneys from disclosing information obtained from other attorneys and other attorneys' clients. Common sense suggests that there can be no joint defense agreement when there is no joint defense to pursue. We so hold.[4]

_____

[4]Given this holding, we need not address other potential problems with the purported joint defense agreement in this case (e.g., the absence of any indicium of corporate authority and the related question of whether corporate officers have the power to bind a corporation to such agreements when a conflict

-23-

## B. **Fed. R. Civ. P. 45(d)(2)**.

As an alternate ground for our decision, we note that the motion to quash was properly denied because the intervenors failed to present sufficient information with respect to the items to which their claim of privilege attaches. The Civil Rules specifically provide that:

> When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications or things not produced that is sufficient to enable the demanding party to contest the claim.

Fed. R. Civ. P. 45(d)(2). The operative language is mandatory and, although the rule does not spell out the sufficiency requirement in detail, courts consentiently have held that the rule requires a party resisting disclosure to produce a document index or privilege log. See, e.g., Bregman v. Dist. of Columbia, 182 F.R.D. 352, 363 (D.D.C. 1998); First American Corp. v. Al-Nahyan, 2 F. Supp. 2d 58, 63 n.5 (D.D.C. 1998); see also Avery Dennison Corp. v. Four Pillars, 190 F.R.D. 1, 1 (D.D.C. 1999) (describing privilege logs as "the universally accepted means" of asserting privilege claims in the federal courts); cf. Vaughn v. Rosen, 484 F.2d 820 (D.C. Ct. App. 1973)

_____

of interest plainly exists).

-24-

(articulating the justifications for requiring privilege logs in the context of the FOIA). A party that fails to submit a privilege log is deemed to waive the underlying privilege claim. See Dorf & Stanton Communications, Inc. v. Molson Breweries, 100 F.3d 919, 923 (Fed. Cir. 1996) (holding that failing "to provide a complete privilege log demonstrating sufficient grounds for taking the privilege" waives the privilege). Although most of the reported cases arise in the context of a claim of attorney-client privilege, the "specify or waive" rule applies equally in the context of claims of work product privilege. See, e.g., Smith v. Conway Org., Inc., 154 F.R.D. 73, 76 (S.D.N.Y. 1994).

In a somewhat indirect fashion, the intervenors suggest that they were hampered in their ability to present a list of privileged documents by the district court's refusal to hold an evidentiary hearing. This suggestion does not withstand scrutiny. After all, the intervenors were not without knowledge of the communications to which the subpoena pertained; Lawyer originally had possession of them and turned them over to Smith & Jones only when Newparent decided to change counsel. Despite this knowledge, the intervenors made no effort to prepare a privilege log. That omission is fatal.

Privilege logs do not need to be precise to the point of pedantry. Thus, a party who possesses some knowledge of the

nature of the materials to which a claim of privilege is addressed cannot shirk his obligation to file a privilege log merely because he lacks infinitely detailed information. To the contrary, we read Rule 45(d)(2) as requiring a party who asserts a claim of privilege to do the best that he reasonably can to describe the materials to which his claim adheres.

At any rate, the district court did not err by failing to hold an evidentiary hearing. We test a trial court's decision on whether or not to convene an evidentiary hearing for abuse of discretion. E.g., David v. United States, 134 F.3d 470, 477 (1st Cir. 1998). Our cases exhibit a strong preference for

> a "pragmatic approach" to the question of whether, in a given situation, an evidentiary hearing is required. The key determinant is whether, "given the nature and circumstances of the case . . . the parties [had] a fair opportunity to present relevant facts and arguments to the court and to counter the opponent's submissions."

In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 302 (1st Cir. 1995) (quoting Aoude v. Mobil Oil Corp., 862 F.2d 890, 893-94 (1st Cir. 1988)). In this instance, the paper record is quite extensive, containing affidavits from Lawyer as well as from representatives of Newparent and Smith & Jones. Furthermore, the intervenors had ample opportunity to respond to the other

-26-

side's arguments, and took advantage of this opportunity by submitting a lengthy offer of proof. Under the circumstances, the district court was not obliged to convene an evidentiary hearing to fill in gaps in the intervenors' privilege claims. See Aoude, 862 F.2d at 894 (observing that matters often can be "heard" adequately on the papers).

Next, the intervenors lament that the district court's failure to rule on their motion for immunity deprived them of the opportunity to supplement the record with further evidence. Even if the district court had denied the immunity motion, the intervenors reason, they would have had an opportunity to decide whether to submit affidavits at the risk of incriminating themselves. This lamentation does not strike a responsive chord.

For one thing, the intervenors' failure to furnish a privilege log cannot plausibly be said to have resulted from the lack of an explicit ruling on the motion for immunity. Roe and Moe could have submitted a privilege log by proffer or over an attorney's signature without in any way compromising their Fifth Amendment rights.

For another thing, although it is plainly the better practice for a trial court to rule explicitly on every substantial motion, it has long been accepted that a trial court

may implicitly deny a motion by entering judgment inconsistent with it. <u>Wimberly</u> v. <u>Clark Controller Co.</u>, 364 F.2d 225, 227 (6th Cir. 1966). In this case, the district court's rejection of the motion to quash effectively denied the intervenors' motion for a grant of immunity. That ruling hardly can be questioned on the merits. The intervenors point to no case authorizing a grant of judicial immunity to a grand jury target in order to facilitate the presentation of a privilege claim, and they offer no persuasive reason why this case should be the first.

What remains is the intervenors' unhappiness with what they characterize as the district court's rush to judgment. The facts are simple: the district court convened a status conference and then converted the status conference into a non-evidentiary hearing on the merits of the intervenors' privilege claims. The proper time to raise an objection to this procedure was directly after the court's announcement of its intention to proceed to the merits, but the intervenors stood mute. Having neither contemporaneously objected to the court's procedural ruling nor sought a continuance, the intervenors have waived any right to complain about the court's timing. <u>See</u> <u>In re United States (Franco)</u>, 158 F.3d 26, 32 n.3 (1st Cir. 1998); <u>United States</u> v. <u>Diaz-Villafane</u>, 874 F.2d 43, 47 (1st Cir. 1989).

-28-

**IV. CONCLUSION**

We need go no further. We hold that the intervenors' claims of privilege fail because the oral joint defense agreement on which they rely cannot defeat Oldco's express waiver of privilege, and, alternatively, because the intervenors failed without justification to produce a privilege log (thereby waiving the underlying attorney-client and work product privileges). Similarly, the district court did not err either in refusing to convene an evidentiary hearing or in ruling simultaneously on the motion to quash and the motion for immunity. Accordingly, the order refusing to nullify the grand jury subpoena is unimpugnable.

**Affirmed.**