van Gestel, J.
This matter is before the Court on two motions by the plaintiffs, one seeking to compel the production of certain documents and the other seeking to compel answers to questions at a deposition. The reasons for resistance in each instance is the attorney/client privilege. Given the nature of the underlying case, the situation seems certain to arise again in the future.
BACKGROUND
In June of 1998, a stock purchase agreement was entered into whereby Garelick Farms, Inc., a subsidiary of one of the plaintiffs, agreed to purchase the stock of one of the defendants, Scangas Bros. Holdings, Inc. (“Scangas Bros.”). The real objective of the agreement was the acquisition of Scangas Bros.’ wholly owned subsidiary, West Lynn Creamery, Inc. (“WLC”).
The remaining defendants consist of Arthur J. Pappathanasi, Nicholas Scangas and Christopher Scangas who were officers and directors of WLC and officers, directors and controlling shareholders of Scangas Bros., and their law firm, Rubin & Rudman LLP (“Rubin & Rudman”), and three partners of Rubin & Rudman, Michael Altman, Gene T. Barton, Jr., and Charles J. Speleotis.
As part of the stock purchase agreement there were representations and warranties, including those having to do with claims, actions, suits, litigation, or investigations pending or threatened against Scangas Bros, or any of its subsidiaries, including WLC. Additionally, Rubin & Rudman, as counsel for the sellers, issued a detailed opinion letter to Garelick Farms, Inc. regarding, among other things, the same issues about litigation, claims, investigations, etc., pending or threatened against Scangas Bros, or its subsidiaries. The opinion letter recites, in its opening sentence, that Rubin & Rudman “have acted as counsel to Arthur J. Pappathanasi, Nicholas Scangas, Christopher Scangas, the Company, West Lynn Creamery, Inc., West Lynn Creamery Realty Corp., Richdale Daily Stores LLC and Richdale Dairy Stores, Inc.” As stated, “the Company” is defined as Scangas Bros. Holding, Inc. Neither any of the defendants, nor Rubin & Rud-man in its opinion letter, revealed a certain matter that is at the heart of this case.
In the fall of 1997, WLC was served with a subpoena issued by the United States Attorney in support of a Federal grand jury investigation in Boston. The subpoena sought documents from WLC related to rebates paid to certain Dunkin’ Donuts franchisees. Rubin & Rudman represented WLC in connection with the subpoena and matters raised thereby.
For many years prior to 1997, Rubin & Rudman has represented Scangas Bros., WLC and other subsidiaries of Scangas Bros, on a wide variety of corporate, real estate and litigation matters. In so doing, Rubin & Rudman has had frequent contact with the individuals involved, including Messrs. Pappathanasi, N. Scangas and C. Scangas. In short, the firm acted pretty much like outside general counsel for Scangas Bros, and WLC, and also as personal counsel on many issues for the individuals involved with the companies.
In March of2001, long after the closing on the stock purchase agreement, and at a time when WLC was then owned by one of the plaintiffs, WLC pled guilty to a criminal information charging it with conspiracy to defraud the United States through a scheme to evade taxes. This scheme involved the Dunkin’ Donuts franchisees’ rebates. The plaintiffs paid a fine and a special assessment of $7,200,400.00 in connection with the matter. This litigation followed.
Now in discovery, the plaintiffs are, among other things, seeking documents from Rubin & Rudman and testimony from certain of its attorneys focused on the issues of who knew what, and when they knew it, about the involvement of WLC in what ultimately led it to plead to the information in 2001. From Rubin & Rudman the information sought relates both to when the lawyers in the firm became aware of the situation and when the entities and individuals who were among the firm’s clients became aware that there was a problem. This, of necessity, involves conversation between Rubin & Rudman lawyers and the individuals *54 running WLC, as well as documents flowing between and among them.
Clearly, liability for failure to disclose the situation by the selling parties, or their attorneys in the opinion letter, if under the circumstances there was any obligation to do so, will turn on what was known and when it was known by both the former Scangas Bros, parties and by the Rubin & Rudman lawyers.
In this context the attorney/client privilege has many shades of gray and few that are black and white. Adding to the mix is the fact that the plaintiffs, now in control of WLC, have waived the attorney /client privilege as to WLC, and presumably will do so with regard to Scangas Bros.
DISCUSSION
The parties are in agreement that the attomey/cli-ent privilege as to WLC has properly been released or waived by it. Scangas Bros, and WLC, at the time of the sale to the plaintiffs, were each closely-held entities that acted at all times by and through a small group of individuals that included particularly Pappathanasi, N. Scangas and C. Scangas. The attorney/client privileges of these individuals have not specifically been released or waived.
When . .. faced with questions regarding the attorney-client privilege, [the Court is] guided by the following principles. The privilege is ordinarily strictly construed . . . The existence of the privilege and the applicability of any exception to the privilege is a question of fact for the judge . . . The burden of proving that the attorney-client privilege applies to a communication rests on the party asserting the privilege . . . This burden extends not only to a showing of the existence of the attorney-client relationship but to all other elements involved in the determination of the existence of the privilege, including (1) the communications were received from a client during the course of the client’s search for legal advice from the attorney in his or her capacity as such; (2) the communications were made in confidence; and (3) the privilege as to these communications has not been waived.
In the Matter of the Reorganization of Electric Mutual Liability Ins. Co. Ltd. (Bermuda), 425 Mass. 419, 421 (1997).
Because “the attorney-client privilege may serve as a mechanism to frustrate the investigative or fact-finding process, it creates an inherent tension with society’s need for full and complete disclosure of all relevant evidence during implementation of the process” . . . But that is the price that society must pay for the availability of justice to every citizen, which is the value that the privilege is designed to secure. The “social good derived from the proper performance of the functions of lawyers acting for their clients . . . outweigh[s] the harm that may come from the suppression of the evidence.”
In the Matter of a John Doe Grand Jury Investigation, 408 Mass. 480, 482 (1990).
The foregoing quotations form the bookends for any discussion of the applicability of the privilege in a given situation.
Here there are occasions in which corporate officers — acting sometimes solely for the corporation, sometimes solely for themselves, and sometimes for both the corporation and themselves simultaneously — seek refuge in the attorney/client privilege from revealing conversations and writings with or by the lawyers who represented both the corporation and the individuals. The recent First Circuit decision in In re Grand Jury Subpoena, A Nameless Lawyer et al., 274 F.3d 563 (1st Cir. 2001) (“Nameless Lawyer”), speaks to the issue. In an almost eerily similar situation, Nameless Lawyer explored issues involved in corporate officers’ claims of the attorney/client privilege in a grand jury investigation of a rebate scheme after the corporation had waived the privilege. There, Judge Selya said: “An individual privilege may exist in these circumstances only to the extent that communications made in a corporate officer’s personal capacity are separable from those made in his corporate capacity.” Id. at 568. The documents in question in Nameless Lawyer, not being shown as solely privileged to the individuals, but rather only jointly privileged, the individuals’ claims of privilege did not survive the corporation’s waiver. Id.
Judge Selya stated well recognized law that if the privilege is that of the corporation only, the corporation’s waiver trumps that of the individuals who may also be involved. Id. at 571. “The default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals’ burden to dispel that presumption.” Id. at 571, citing to United States v. Bay State Ambul. & Hosp. Rental Service, Inc., 874 F.2d 20 (1st Cir. 1989). Thus, the Rubin & Rudman lawyers and their individual clients bear the burden of rebutting this presumption. Id. at 28.
“ [Communications may be individually privileged only when they ‘[do] not concern matters within the company or general affairs of the company,’ rather than when they do concern an individual’s rights.” Nameless Lawyer, supra, 274 F.3d at 573. Consequently, an individual, under the circumstances presented, may only successfully assert the attorney/client privilege “when individual acts and liabilities are segregable from discussions about the corporation.” Id. The fact that the documents or the subject of the conversations “do not lend themselves to separation into individual and corporate categories” dooms the individuals’ claims of privilege. Id. at 574.
In In re Bevill, Bresler & Schulman Asset Mgmt. Corp., 805 F.2d 120 (3d Cir. 1986), the Third Circuit set out a five-part test that Judge Selya considered in Nameless Lawyer. The corporate officer claiming the *55 privilege must establish that he or she: (1) approached counsel for the purpose of seeking legal advice; (2) made it clear to the attorney that he or she was seeking legal advice in an individual rather than a representative capacity; (3) counsel saw fit to communicate with the officer in his or her individual capacity, knowing that a possible conflict could arise; (4) the conversation was confidential; and (5) the substance of the communication with counsel did not concern matters within the company or the general affairs of the company. Id. at 123.
Beuill did not hold that there could be no individual privilege for a corporate officer. Rather, when the communications dealt with the officer’s individual rights and responsibilities, as opposed to those of the corporation, and the other elements for privilege exist, there could still be a privilege for the individual despite a waiver by the corporation. Nameless Lawyer, supra, 274 F.3d at 572.
Judge Selya, in Nameless Lawyer, concluded that there was no privilege there because “the individuals’ allegedly protected communications with the lawyer did not appear to be distinguishable from discussions between the same parties in their capacities as corporate officers and corporate counsel, respectively, about matters of corporate concern.” Id. at 573.
While this Court is not necessarily bound by the decisions of the Federal Circuit courts, it finds those discussed above to be compelling in their analysis and logic. Thus, there being no Massachusetts appellate cases directly on point, this Court will rule in a manner consistent with the Federal decisions.
ORDER
The Court makes the following rulings in an effort to give the parties guidance on the attorney/client privilege issues raised by the two motions. The Court will not otherwise act on the two motions, leaving it to counsel, within the spotlight of the following rulings, to first attempt to resolve any further disputes on these issues.
(1) In the circumstances presented by the two motions, Rubin & Rudman and its lawyers begin with the presumption that in connection with the grand juiy rebate investigation they represented WLC and in connection with the stock purchase agreement they represented Scangas Bros, and its corporate subsidiaries, including WLC.
(2) Rubin & Rudman, and Messrs. Pappathanasi, N. Scangas and C. Scangas, have the burden of establishing that any communications about which they seek to claim an individual privilege do not concern matters within the company or general affairs of the company. The “company” here includes Scangas Bros, and WLC, as well as any other subsidiary of Scangas Bros.
This burden extends not only to a showing of the existence of the attorney-client relationship but to all other elements involved in the determination of the existence of the privilege, including: (i) that the communications were received from a client during the course of the client’s search for legal advice from the attorney in his or her capacity as such; (ii) that the communications were made in confidence; and (iii) that the privilege as to these communications has not been waived.
(3) In the event that documents or the subject of the conversations from, to or with Rubin & Rudman lawyers do not lend themselves to separation into individual and corporate categories, the individuals’ claims of privilege cannot be honored.
(4) Only when individual acts and liabilities are segregable from discussions about Scangas Bros, or WLC, or any other subsidiary of Scangas Bros., may the individuals’ claims of attorney/client privilege be honored. Thus, an individual privilege may exist in these circumstances only to the extent that communications made in a corporate officer’s personal capacity are separable from those made in his corporate capacity. In other words, the individuals’ allegedly protected communications with the lawyer must be distinguishable from discussions between the same parties in their capacities as corporate officers and corporate counsel, respectively.